IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| DIVX, LLC, *Plaintiff*, v. AMAZON.COM, INC. ET AL., *Defendants*. | 1:24-cv-2061-MSN-LRV |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court for claim construction (ECF 87, 89). DivX, LLC ("DivX") is the owner of seven patents[1] ("Asserted Patents") pertaining to video streaming. DivX has sued Amazon.com, Inc. and Amazon Web Services, Inc. (collectively, "Amazon"), alleging infringement of the Asserted Patents. ECF 22.

The parties disagree on the construction of nine claim terms.[2] Opening claim construction briefs were filed on September 12, 2025 (ECF 87 ("Amazon Br."), 89 ("DivX Br.")), and responsive claim construction briefs were filed on September 26, 2025 (ECF 91 ("Amazon Resp.), 92 ("DivX Resp.")). The Court held a *Markman* hearing on October 10, 2025. Having considered the briefs, the exhibits attached thereto, and the arguments of counsel at the hearing, the Court now construes the nine disputed claim terms as set forth below.

## I.    LEGAL STANDARDS

### A.    CLAIM CONSTRUCTION

The purpose of the claim construction process is to "determin[e] the meaning and scope of

---

[1]    The seven patents are: U.S. Patent Nos. 10,412,141 ("141 patent"), 10,715,806 ("806 patent"), 9,955,195 ("195 patent"), 11,611,785 ("785 patent"), 10,542,303 ("303 patent"), 11,245,938 ("938 patent"), and 12,184,943 ("943 Patent").

[2]    Although DivX's opening claim construction brief addressed the tenth term, "sufficient data is buffered to commence playback" in claim 20 of the 141 Patent, the parties have filed a joint notice stating that this term was inadvertently included by Amazon in its Disclosure of Proposed Claim Constructions and Extrinsic Evidence and that construction is not requested. ECF 90. Accordingly, the Court will not address this term in this opinion and order.

the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The question of the proper construction of a patent is a question of law, although courts must sometimes engage in subsidiary fact-finding. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837–38 (2015). Terms contained in claims "are generally given their ordinary and customary meaning." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art [("POSA")] in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). When determining the ordinary meaning of claim terms, courts do not derive meaning of terms devoid of the context from which they arose. *Id.* at 1321. Rather, courts endeavor to reflect their "meaning to the ordinary artisan after reading the entire patent." *Id.*

"When construing claim terms, the court first looks to, and primarily rel[ies] on, the intrinsic evidence, including the claims themselves, the specification, and the prosecution history of the patent." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013). "The claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* "Other claims of the patent in question, both asserted and unasserted, can [also be valuable]" in discerning the meaning of a disputed claim term. *Phillips*, 415 F.3d at 1314. That is so because "claim terms are normally used consistently throughout the patent," and so "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.*

Moreover, a patent's "claims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). Not only is the specification "always

highly relevant to the claim construction analysis" but "[u]sually, it is dispositive [as] it is the single best guide to the meaning of a disputed term." *Id.* Courts should also consider the patent's prosecution history, as it may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Id.* at 1317.

In certain instances, the Court may also consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, courts may "need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand . . . the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. While extrinsic evidence may be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (cleaned up).

## B.     INDEFINITENESS

Section 112 of Title 35 imposes a definiteness requirement on patent claims. It requires that the claims "particularly point[] out and distinctly claim[] the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). "The primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, e.g., competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prod., Inc.*, 309 F.3d 774, 779–80 (Fed. Cir. 2002). "A patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). As

with claim construction, definiteness should be assessed from the viewpoint of a person of ordinary skill in the art at the time the patent was filed. *Id.* at 908. The party asserting indefiniteness must prove it by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). Courts, including those in this District, routinely make determinations about indefiniteness at the claim construction stage. *E.g., Bushnell Hawthorne, LLC v. Cisco Sys.*, 2019 WL 2745735, at *9 (E.D. Va. July 1, 2019).

### C.    MEANS-PLUS-FUNCTION

A patent claim may be expressed using functional language. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015). Under 35 U.S.C. § 112(f) or § 112 ¶ 6, a structure may be claimed as a "means . . . for performing a specified function" and an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002). When it applies, § 112(f) or § 112 ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347.

"The overall means-plus-function analysis is a two-step process." *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022). First, the Court must "determine whether a claim limitation is drafted in means-plus-function format, which requires [the Court] to construe the limitation to determine whether it connotes sufficiently definite structure to a person of ordinary skill in the art." *Id.* There is a rebuttable presumption that § 112(f) or § 112 ¶ 6 applies when the claim language includes "means" or "step for" terms, and a rebuttable presumption it does not apply in the absence of those terms. *Masco Corp.*, 303 F.3d at 1326. The essential inquiry is "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1348. Such an inquiry turns on

"[i]ntrinsic evidence, such as the claims themselves and the prosecution history," as well as extrinsic evidence. *Dyfan*, 28 F.4th at 1365–66.

If the limitation is drafted in a means-plus-function format under step one, the Court proceeds to step two, in which the Court then "determine[s] 'what structure, if any, disclosed in the specification corresponds to the claimed function.'" *Dyfan*, 28 F.4th at 1365 (quoting *Williamson*, 792 F.3d at 1351). A means-plus-function claim is indefinite if the specification fails to disclose adequate corresponding structure to perform the claimed function. *Williamson*, 792 F.3d at 1351–52.

## II.    CLAIM CONSTRUCTION

### A. The 195 Patent and 785 Patent

The 195 patent concerns video encoding and streaming and purports to provide a simplified way to deliver "a large number of streams of video content to a large variety of playback devices" by "specifying a limited number a maximum bitrates at which video content can be encoded." ECF 22-3 ("195 Patent") at 1:15-20, 4:36-31. The 785 Patent is a continuation of the 195 Patent and also relates to adaptive bitrate streaming. ECF 22-4 ("785 Patent" ) at 1:9-17, 39-42.

### 1. "maximum bitrate(s)" – 195 Patent Claim 1

Claim 1 of the 195 Patent states:

What is claimed is:
1. A source encoder, comprising:
    a processor; and
    storage containing an encoding application and data relating each of a plurality of combinations of a resolution and a frame rate to maximum bitrates;
        wherein the encoding application directs the processor to:
            receive a selection of a plurality of combinations of a resolution and a frame rate for encoding of video content;
            determine an optimal target maximum bitrate for at least one of the received plurality of combinations from the data relating each of the plurality of combinations to maximum bitrates, where an optimal target maximum bitrate is the lowest bitrate at which a highest video quality criterion is satisfied for a specific combination of resolution and frame rate;
            determine a set of maximum bitrates from the optimal target maximum

bitrates determined from each of the plurality of combinations; and

encode the video content into a plurality of alternative streams wherein each of the plurality of alternative streams is encoded at a maximum bitrate from the determined set of maximum bitrates and one of the plurality of combinations of resolutions and frame rates that has an optimal target maximum bitrate at the maximum bitrate.

| DivX Construction | Amazon Construction |
|---|---|
| No construction needed. Alternatively, plain and ordinary meaning. | "the highest bitrate used to encode the video content" |

Amazon argues that its construction is necessary because the claim language, specification, extrinsic expert evidence, and ITC construction of a related patent ("297 Patent") establish that a single "maximum bitrate" is a property of each video content stream. Amazon Br. at 5-6; Amazon Resp. at 1, 2. DivX denies that any construction is necessary because the claim language does not require a "single 'highest bitrate'" but allows for "multiple 'maximum bitrates'" and because the specification shows that "'maximum bitrates' are not necessarily the 'highest' bitrate used to encode video content, but rather are assigned to particular contexts and can be calculated in several different ways." DivX Br. at 2-4; DivX Br. at 1–3.

The claim language plainly indicates that the recited encoder encodes video content into alternative streams, each using one of the determined set of "maximum bitrates" from determined "optimal target maximum bitrates." 195 Patent at cl. 1. Thus, the claim language inherently supports that there is ultimately only one "maximum bitrate" corresponding to an individual stream of encoded video content, even if there can be multiple "maximum bitrates" across different streams and multiple calculated maximum bitrates existing throughout the claimed process that may not be used to encode. Further, although the specification and various embodiments (e.g., 195 Patent at 5:9-11, 29-36) contemplate that "maximum bitrate" may be calculated in numerous ways, this is not at odds with the conception of "maximum bitrate" as a property of a single encoded

stream that defines a limit or ceiling on the particular stream's bitrate.[3] Accordingly, the Court construes "maximum bitrate" as "the highest bitrate used to encode a particular stream of video content."

| Final Construction |
|---|
| "the highest bitrate used to encode a particular stream of video content" |

2. **"determine an optimal target maximum bitrate for at least one of the received plurality of combinations" / "where an optimal target maximum bitrate is the lowest bitrate at which a highest video quality criterion is satisfied" – 195 Claim 1; "evaluating quality for each of the multiple encodings" / "selecting a plurality of resolution and target bitrate combinations for a plurality of alternative streams based on the evaluated quality of each of the multiple encodings" – 785 Claim 1**

| DivX Construction | Amazon Construction |
|---|---|
| 195 Claim 1: No construction needed. Alternatively, the "optimal target maximum bitrate(s) is the "the lowest bitrate at which a highest video quality criterion is satisfied for a specific combination of resolution and frame rate," as set forth in claim 1. The remainder of these phrases should be given their plain and ordinary meaning. | Indefinite |
| 785 Claim 1 – No construction needed. Alternatively, plain and ordinary meaning. | Indefinite |

The parties next dispute the construction of terms with steps related to "quality" in the 195 and 785 Patents. Amazon contends that 195 Patent Claim 1 requires determination of the "optimal target maximum bitrate" based on the wholly subjective and undefined "highest video quality criterion" which makes the claim indefinite and thus invalid. Amazon Br. at 7, 8; Amazon Resp.

---

[3]    DivX appears to suggest that Amazon's construction of "maximum bitrate" refers to some global maximum bitrate or is a function that takes the greatest of bitrates, *see* DivX Br. at 3; DivX Resp. at 2, but the Court does not agree with this notion, which is unfounded.

at 4. Amazon similarly argues that 785 Patent Claim 1 is indefinite because it too requires "evaluating [video] quality" even as no objective measure is provided or understood by a person of skill in the art ("POSITA"). Amazon Br. at 10. Amazon claims that because the claims require subjective evaluation of quality on their face and the specification provides no guidance, the Court need not consult any extrinsic evidence to determine if there are "objective bounds." Amazon Resp. at 5, 6 & n.3 (citing *Interval Licensing, LLC v. AOL, Inc.*, 766 F. 3d at 1731 (Fed. Cir. 2014) ("The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art.").

For its part, DivX insists that the claims are not indefinite because "the scope of the claims does not depend on subjective assessment of '[video] quality.' Rather, the claims only require an input regarding video quality." DivX Br. at 4, 5. DivX claims that courts have permitted similar instances where the "patents are not directed to defining the video quality of a given encoding" but instead "allow the practitioner to decide what metric [subjective or objective] for video quality to use and then act based on that metric." *Id*. at 5, 6 (citing *Stingray IP Solutions, LLC v. Legrand*, 2022 WL 1138202, at *11 (E.D. Tex. April 14, 2022); *Colt Int'l Clothing, Inc. v. Quasar Sci. LLC*, 2025 WL 2402797, at *14 (D. Del. Aug. 19, 2025)). DivX further asserts that intrinsic and extrinsic evidence confirm that subjective and objective video quality evaluation methods were well-understood at the time of the inventions and that a POSITA would understood how to measure quality. *Id*. at 7; DivX Resp. at 4.

The intrinsic and extrinsic evidence indicate that the claim terms pertaining to "quality" are indefinite. The scope of the claims undoubtedly depends on the definition of what is a measure for quality and a degree of quality. 195 Patent cl. 1; 785 Patent cl 1. The specifications provide no guidance on what quality is or how to measure it, as they state that "video quality is subjective . . . there is no concept of a 'true' optimal target maximum bitrate. The optimal target maximum

bitrate is simply a value that can be determined through subjective experimentation." 195 Patent at 8:14-19; 785 Patent at 8:20-25. In the prosecution of the 195 Patent, the applicant similarly emphasized the indeterminate breadth of "video quality," describing it as "any measure of quality associated with video files that is more subjective than resolution quality and/or frame rate quality alone." ECF 87-2 at -00164055-56 (emphasis added). As much as DivX's extrinsic textbook evidence shows that both subjective and objective methods of quantitative quality measurement existed at the time of invention, *see* ECF 89-11 at -0560150, -151, -153, such evidence does not carry DivX's ultimate position because: (1) it does not suggest that that selection of a measurement is not essentially subjective or that there is a consensus on measurement that a POSITA would recognize;[4] (2) the intrinsic record establishes that the claims' scope extends beyond DivX's cited measurements;[5] and (3) other testimony from Amazon's expert Dr. Schonfeld underscores that the field of quality measurement is too indeterminate as to allow a POSITA to understand the bounds of the claims.[6]

DivX's reliance on *Stingray* and *Colt International* to assert that the claims are not indefinite because they merely require that a subjective determination is "made or used" is

---

[4]    Notably, the textbook provides that "[m]any different approaches have been proposed" to "develop a more sophisticated objective test that more closely approaches subjective test results," "[i]t has proved difficult to establish reliable objective video quality metrics that accurately predict the results of subjective tests," and objective quality measurements identified by DivX "have varying degrees of success in predicting subjective test scores." ECF 89-11 at -0560163.

[5]    The scope of the claims defined by the intrinsic record extends beyond the methods identified by DivX to an uncertain degree. Accordingly, it would be inappropriate to "cull out" DivX's methods to "serve as the exclusive definition of a facially subjective claim term." *See Interval Licensing*, 766 F. 3d at 1373-74; *see also id.* ("a skilled artisan is still left to wonder what other forms of display are unobtrusive and non-distracting").

[6]    *See* ECF 92-2 at 90:2-5 ("quality is a nebulous term. I don't even know what it refers to . . . it's not a precise term"), 10-13 ("There are many other criteria for comparing . . . you could view quality as another one of those terms, but it's very different because it's not a precise term"); 91:3-14 (". . . there is not a consensus as to how to go about that problem. It is almost an intractable problem because it's trying to put a mathematical equation on a complex process done by the human brain, and it's done differently by each person"); 91:20–92:8 ("there were many [quality measure] techniques. You could generate an infinite number of such criteria . . . there was a whole conference in a school, in a field that emerged in the '90s . . . and may still be active today where they were just generating different criteria like this one after another, all different, all incompatible with one another, all trying to address the same problem. That issue is not resolved.").

unavailing. The claim terms in those cases involved wholly subjective judgments, but importantly, definite objective measures existed and were provided to gauge those judgments. *See Stingray*, 2022 WL 1138202, at *11 ("there is an objective measure for when [the first channel falls below the 'Quality of Service threshold'] even though the claim does not limit what that threshold must be"); *Colt Int'l*, 2025 WL 2402797, at *14-15 ("the claim allows the user to decide which skin appearance he or she seeks, and then enables the user to select a temperature of light from within a set range that produces the desired skin appearance"). That is simply not the case here. Rather, the claim terms at hand are similar to "optimizing [Quality of Service]" in *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, in which the Federal Circuit concluded that the "[Quality of Service] requirements" to be optimized were "entirely subjective and user-defined" and "optimizing Quality of Service" was a "term of degree" that was "purely subjective" and dependent on "the unpredictable vagaries of any one person's opinion."[7] 902 F. 3d 1372, 1381 (Fed. Cir. 2018). Video "quality" is too "entirely subjective and user-defined" and "a relative term" with "different meanings for different users," and with no measure for such, "highest video quality" and "evaluating quality" are also terms of degree that "fail[] to provide [a POSITA] with any way to determine" what constitutes "highest" quality or "evaluat[ion]" of quality. *Id.* (cleaned up).

Accordingly, the Court finds that 195 Patent Claim 1 and 785 Patent Claim 1 do not provide "objective boundaries for those of skill in the art" and are thus indefinite.

| Final Construction |
|:---:|
| **195 Claim 1 - Indefinite** |
| **785 Claim 1 - Indefinite** |

---

[7]     *See also Intellectual Ventures*, 902 F. 3d at 1381 ("The [] patent analogizes QoS to a 'continuum, defined by what network performance characteristic is most important to a particular user' and characterizes it as a 'relative term, finding different meanings for different users.' 'Ultimately,' the [] patent states, 'the end-user experience is the final arbiter of QoS.").

**B. The 303 Patent**

The 303 Patent concerns encrypting video content encoded using the High-Efficiency Video Coding standard. Claim 16 of the 303 Patent claims a decoder application that identifies encryptions portions within the video bitstream, decrypts those portions as needed, and decodes the video for playback. ECF 22-5 ("303 Patent") at 14:66-15:5.

**1. "decoder application" – Claim 16.**

Claim 16 of the 303 Patent states:

[What is claimed is:]
16. A content decoder comprising:
    a memory; and
    a processor configured to communicate with the memory, where the memory contains a decoder application;
        wherein the decoder application directs the processor to:
            receive a video bitstream comprising plurality of frames, each frame comprising plurality of tiles that divide the frame into rectangular areas, wherein each tile is an independently encoded compression unit that is encoded without dependence from information in another tile;
            determine locations of encrypted portions of a plurality of tiles within the video bitstream based on information provided by at least one metadata header associated with a frame of video;
            decrypt a portion of each of a plurality of tiles within the frame of video based on the determined locations; and
            generate an output decoded video for playback.

| DivX Construction | Amazon Construction |
|---|---|
| No construction needed. Alternatively, plain and ordinary meaning, i.e., one or more instructions for directing the processor to perform one or more tasks as claimed. | A software application that directs the processor to decode. |

With regard to Claim 16, the parties dispute the meaning of "decoder application." Amazon argues that its construction is correct because the intrinsic record and ordinary meaning of the term indicate that it is distinct from hardware or an operating system and is instead intangible code and instructions that are stored in memory and executed by a processor to perform the task of decoding.

11

Amazon Br. at 11. Amazon also rejects DivX's alternative construction because it unjustifiably equates "application" with "instructions" and eviscerates the recited "decoder." Amazon Resp. at 7. In response, DivX contends that nothing in the claim or specification supports restriction to "software," and not the operating system, and to the contrary, the specification (when read with the assistance of extrinsic computer dictionaries) shows that the decoder application can be "firmware" when stored in non-volatile memory. DivX Br. at 9, 10; DivX resp. at 8. DivX also denies that construction of the term is necessary at all. DivX. Resp. at 9. Amazon rejects DivX's conception, arguing that the decoder application cannot be firmware because it cannot be held within one type of non-volatile memory, read-only memory ("ROM"), because a video distribution system that is used to serve video content would be useless if no new content could be added to the ROM. Amazon Resp. at 8.

No construction of "decoder application" is necessary. Nothing in the intrinsic record compels the conclusion that the decoder application is limited to "software" to the exclusion of firmware or an operating system, as Amazon proposes.[8] Notably, as identified by DivX, the specification shows that the decoder application may be held in non-volatile memory, and DivX's extrinsic evidence establishes that one type of non-volatile memory is flash memory, something that no one has suggested is read-only as to render it unsuitable for the claim context, which renders the decoder application "firmware" or an "embedded application" or "combination hardware/software" or "hard software." *See* DivX Br. at 9 (citing ECF 89-14, 89-16, 89-17); DivX. Resp. at 8 (citing ECF 92-27). DivX's alternative construction, however, also sweeps too broadly

---

[8]     At oral argument, DivX characterized Amazon's construction as an attempt to construct "software" within its construction of "decoder application." Regardless of whether this is a proper course of action, the Court agrees that Amazon's construction, citing but inadequately defining "software," would not elucidate the meaning of "decoder application" but muddle the definition of the claim term further. Additionally, because Amazon's construction evokes "software" without clear definition, Amazon's construction of "a software application that directs the processor to decode" is circular and cumulative of the plain language of the claim. *See Sparton Corp. v. United States*, 68 Fed. Cl. 34, 47 (Fed. Cl. 2005); *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix Inc.*, 2010 WL 11450408, at *18-20 (E.D. Va. June 10, 2010).

because it expands the scope of the claim to "instructions" generally.

Accordingly, the Court declines to construe "decoder application" as used in 303 Patent Claim 16.

| Final Construction |
|---|
| No construction needed. |

## C. The 141 Patent

The 141 Patent concerns "trick play" functionality, or user controlled features like fast-forward, fast-rewind, pause, and skip, on a video playback device. ECF 22-1 ("141 Patent") at 2:23-39.

**1. Order of steps for "obtaining information," "selecting a video track," "requesting a header," "selecting an audio track," "obtaining index information," "determining byte ranges to request," and "requesting byte ranges" – Claim 20.**

Claim 20 of the 141 Patent in relevant part recites:

20. A method of playing back content on a playback device, comprising:
. . . .
(20.b) obtaining information from a remote server system using the playback device, where the obtained information describes at least one video track, multiple audio tracks, and multiple subtitle tracks;
(20.c) selecting a video track from the at least one video track;
(20.d) requesting a header describing the at least one video track using the playback device;
(20.e) selecting an audio track from the at least one video track;
(20.f) obtaining index information indicating the locations of audio and video data within the selected audio and video tracks;
(20.g) determining byte ranges to request from the selected audio and video tracks using the index information;
(20.h) requesting byte ranges to request from the selected audio track and the selected video track from the remote server system using the playback device
. . . .

| DivX Construction | Amazon Construction |
|---|---|
| No construction needed regarding order of steps | The recited steps must occur in the same order as recited in the claim. |

Next, Amazon asserts that steps 20.b through 20.h of Claim 20 should be construed as necessarily occurring in the same order as recited, while DivX argues that no ordering is necessary. Amazon posits that both logic and grammar—here, extensive use of antecedent basis ("the") linking the steps and observation that certain steps must necessarily occur after some precursor steps—require the ordering, also citing the prosecution history and the ITC's construction of ordering in Claim 1 of the related 588 Patent. Amazon Br. at 13-15. DivX argues that ordering is improper because antecedent basis alone does not justify imposing ordering and the specification embodiments confirm that the steps can be performed "out of order." DivX Br. at 16-19. DivX also denies the relevancy of the ITC decision. DivX Resp. at 16. Amazon insists that the Court need not consult the specification or other evidence because the claim language on its face requires an order of steps, and in any case, DivX's reliance on the specification is unfounded. Amazon Resp. at 10-11.

Ordering of certain of steps 20.b through 20.h of Claim 20 is necessary, but not to the full extent suggested by Amazon. Although generally it is true that "unless the steps of a [] claim actually recite an order, the steps are not ordinarily construed to require one," ordering of steps is required where the claim language "as a matter of logic or grammar, requires that steps be performed in the order written, or [where] the specification directly or implicitly requires an order of steps." *Mformation Techs., Inc. v. RIM Ltd.*, 764 F. 3d 1392, 1398-99 (Fed. Cir. 2014) (cleaned up). Antecedent basis, indicated by use of "the" or "said," imposes step ordering. *Id*. (citing *Wi-Lan v. Apple, Inc.*, 8911 F. 3d 455, 462 (Fed. Cir. 2016)). That basis ("the") is present here and indicates that: (1) 20.b must occur before 20.c, 20.d, and 20.e; (2) 20.c and 20.e must occur before 20.f, 20.g, and 20.h; (3) 20.f must occur 20.g; and (4) 20.g must occur before 20.h.[9] Logic compels the same ordering. Visually, this ordering is represented as follows:

---

[9]    Specifically, selection of a video track in 20.c is from, and requesting of a header in 20.d pertains to, "the at least one video track" that information is obtained about in 20.b; selection of an audio track in 20.e is from the "the



To the extent that Amazon suggests that all steps in 20.b through 20.h be strictly ordered in excess of the above, and it is not clear that Amazon is requesting so, nothing in the intrinsic or extrinsic record supports such construction.[10] Because the claim language is clear, it is not necessary for the Court to examine the specification, as DivX suggests. *Hytera Commc'ns Co. v. Motorola Sols.*, 841 F. App'x 210, 218 (Fed. Cir 2021) ("Because we conclude that the claim language demonstrates the order of the steps, we need not look further into the specification.").

Nevertheless, DivX's suggestion that the specification belies ordering in various ways does not hold water. DivX claims that the specification allows "determining byte ranges to request" (20.g) after "requesting byte ranges" (20.h) where "any of the bytes within a requested byte range have been previously downloaded," DivX Br. at 17, however the embodiment cited merely describes determining whether any bytes have already been downloaded so new download requests are limited to undownloaded bytes. 141 Patent at 8:28-32. DivX also contends that the specification "teach[es] [] a flexible and efficient system that includes non-sequential and

---

multiple audio tracks" that information is obtained about in 20.b; obtaining of index information in 20.f is regarding audio and video data within "the selected audio and video tracks" from 20.c and 20.e; determination of byte ranges in 20.g is from "the selected audio and video tracks" from 20.c and 20.e using "the index information" from 20.f; and requesting of byte ranges in 20.h is from "the selected video track and the selected audio track" from 20.f.

[10]    Notably, the declaration of Amazon's expert Dr. Schonfeld supports the above ordering. *See* ECF 87-6 ¶¶ 67–69.

asynchronous processing" through various disclosures, DivX Br. at 17, 18, but DivX fails to explain how its conclusion that these disclosures require performance of the recited steps "out of order," which is in no way obvious. Nor does the assertion that "because all of the requested or obtained information is part of the media file, including the information obtained in (20.b) and the index information obtained in (20.f), the claimed invention necessarily can [perform 20.c, 20.e, 20.f, and 20.g] based on previously downloaded portions of a media file," DivX Br. at 18, reveal similarly.[11] That one embodiment shows that "media chunks" corresponding to byte ranges can be requested prior to the downloading of the "entire index," 141 Patent at 11:2-3; DivX Br. at 18, also does not conflict with the claim ordering, as it is only necessary to "obtain[] index information" (20.f), not the <u>entire</u> index, before "determining byte ranges to request . . . using the index information" (20.h). Further, it is implausible that the claim permits simultaneously "obtaining information from a remote server system" (20.b) and "obtaining index information" (20.f), DivX Br. at 18, because the claim language plainly states that at 20.f, index information is obtained on data "within the selected audio and video tracks," and selection does not occur until 20.c and 20.e, coming after 20.b. Moreover, "every claim does not need to cover every embodiment," which is "particularly true where the plain language of a limitation of the claim does not appear to cover that embodiment."[12] ECF 87-5 ("ITC Op.") at 25.n10 (citing *Pacing Techs. LLC v. Garmin Int'l, Inc.*, 778 F. 3d 1021, 1026 (Fed. Cir. 2015).

Accordingly, the Court finds that Claim 20 of 141 Patent to require ordering as discussed above.

---

[11]    The specification seems to contemplate that the claimed process can be run sequentially, *see, e.g.*, 141 Patent at 8:28-32, but to the extent that DivX is suggesting that the claim allows 20.b and 20.f to be skipped based on the use of previously downloaded information, the steps would never occur out of order in the true sense (i.e., the necessary information must always be obtained at some iteration of 20.b and 20.f prior to the occurrence of other steps that rely on such information).

[12]    The Court also finds that the claim prosecution history (*see* Amazon Br. at 15 n.5) and the ITC's treatment of ordering in Claim 1 of the 588 Patent to be generally persuasive on the issue of ordering of Claim 20 of the 141 Patent.

| Final Construction |
|---|
| (1) 20.b must occur before 20.c, 20.d, and 20.e; |
| (2) 20.c and 20.e must occur before 20.f, 20.g, and 20.h; |
| (3) 20.f must occur 20.g; and |
| (4) 20.g must occur before 20.h. |

**2. "seek instruction" – Claims 20, 28, and 30**

Claim 20 of the 141 Patent in relevant part recites:

20. A method of playing back content on a playback device, comprising:

….

Responding to receipt of a seek instruction at the playback device by;
    pausing playback on the playback device;
    determining byte ranges to request from the selected audio and video tracks based upon a new playback location using the index information;
    requesting byte ranges required to play the selected audio and video tracks from the new playback location from the remote server using the playback device;
    buffering received bytes of information comprising audio and video data pending resumption of playback using the playback device; and
    checking that sufficient data is buffered to commence playback and playing back the buffered audio and video data using the playback device.

| DivX Construction | Amazon Construction |
|---|---|
| No construction needed. [Does not exclude "trick play" instructions, such as rewinding, fast forwarding, and skipping between scenes.] | "instruction to commence playback from a new playback location" |

Moving along, Amazon states that its construction of "seek instruction" in Claims 20, 28,[13] and 30[14] is necessary because the claims require a series of responses to a seek instruction that culminate in playback of buffered data from "a new playback location." Amazon Br. at 16. DivX refutes this construction, claiming that it is unsupported by the specification and that it would

---

[13]    Claim 28 extends to "[t]he method of claim 20, wherein playing back the buffered video data from the requested byte ranges provides fast rewind trick play." 141 Patent at 16:11-13.

[14]    Claim 30 extends to "[t]he method of claim 20, further comprising flushing previous byte range requests in response to the received seek instruction." 141 Patent at 16:22-24.

improperly limit the claims to instructions to skip between scenes to the exclusion of trick play functions, like fast-forward and fast-rewind recited in dependent claims 26 and 27. DivX Br. at 20-22. Amazon denies that its construction requires skipping between scenes or excludes trick play. Amazon Resp. at 12, 13.

"Seek instruction" will be construed as an "instruction to commence playback from a new location." As DivX recounted at oral argument, the parties' construction dispute arises not from whether "seek instruction" per se excludes trick play and limited to skipping between scenes—the parties (and the Court) agree that "seek instruction" is not so narrow—rather, DivX denies that a "seek instruction" itself specifies a playback location.[15] DivX Resp. at 19; ECF 108 ("Hearing Tr.") at 54:18-56:18. The Court does not agree with DivX's position. DivX contends that because the specification states that "[w]hen a user provides a 'trick play' instruction, the device uses the index to determine the portion[s] [] of the media file that are required to execute the 'trick play' function and request those portions from the server," 141 Patent at 6:34-38, it is true then that "the playback device determines a new playback location in the course of responding to the instruction." DivX Br. at 22; DivX Resp. at 92. This overreads the specification, which makes clear that "a new playback location" is embodied in the seek instruction, because a "user['s]" seek instruction "select[s] [a] <u>different location</u>[] from which to commence viewing," upon which "the media information required to <u>commence playing</u> the media is requested [] and played back []." 141 Patent at 6:55-60 (emphasis added). Only after the seek instruction provides the new playback

---

[15]     DivX also argues that the seek instruction does not "instruct a playback device to 'commence playback,'" DivX Br. at 22; DivX Resp. at 19, but DivX does not explain the basis for this contention (if it is distinct from DivX's argument on the specification of "new playback location") and it is plain from the claim language and specification that a seek instruction does ultimately instruct a playback device to commence playback.

location does the playback device use the index to determine associated byte ranges to request in order to commence playback.[16]

Accordingly, the Court constructs "seek instruction" as stated in Claims 20, 28 and 30 of 141 Patent as "instruction to commence playback from a new playback location."

| Final Construction |
| --- |
| "instruction to commence playback from a new playback location" |

### D. The 943 Patent

The 943 patent relates to the playback of encrypted video. ECF 22-14 ("943 patent") at 11:2-3. To prevent unauthorized viewing, content distributors transmit encrypted versions of their videos to playback devices. *Id.* at 1:42-47. The 943 Patent provides that encrypted data is received by a decoder located on the playback device. *Id.* at 2:55-61. The video decoder will then rely on a digital rights manager to decrypt the video data and decode the decrypted video data. *Id.* at 7:11-19, 54-56. Once the data is decrypted and decoded it can be displayed to viewers on a playback device. *Id.* at 2:55-61.

#### 1. "cipher" – Claims 1 and 2

| DivX Construction | Amazon Construction |
| --- | --- |
| No construction needed. Alternatively, plain and ordinary meaning, i.e., a procedure used to secure information | "a procedure to scramble or unscramble secure data [the cryptographic material] without using a key" |

---

[16] As for the extrinsic evidence, this tends to support Amazon's construction too. DivX also asserts that Amazon expert Dr. Schonfeld admitted that the "seek instruction is, in fact, not the only way to identify a playback location," based on his suggestion that "a user clicking the fast-forward button on a remote control" could be a seek instruction "as long as the new location is provided in response to that particular press of the button" and that a playback location could be "inferred from the seek instruction." DivX Resp. at 25. But Dr. Schonfeld did not agree that in either scenario, the playback location was extrinsic from the seek instruction. ECF 92-2 at 185:22-187:12. Amazon's conception of seek instruction as specifying a new playback location is also consistent with the Xu and Wu prior art references. Amazon Br. at 16 n.6; ECF 89-20.

The parties next dispute the construction of "cipher." Amazon contends that its construction is necessary because the patentee has acted as a lexicographer to specifically define the term as excluding the use of a key, which is supported by the specification not "disclos[ing] any embodiments of a cipher that use a key . . . while all the described embodiments use a key for encryption[.]" Amazon Br. at 18, 19. DivX, on the other hand, opposes construction because the patentee did not act as lexicographer such that plain and ordinary meaning is displaced, nothing prohibits use of a key as opposed to stating it is merely not required, the AES embodiment recited in Claim 2 in fact uses a key, and a "scramble or unscramble" limitation is unsupported. DivX Br. at 29, 30; DivX Resp. at 19-21.

"Cipher" will be constructed as "a procedure to scramble or unscramble secure data [the cryptographic material] without using a key." The specification shows that the patentee expressly defined "cipher" and "encrypt" (departing from the ordinary meaning of "cipher" as requiring a key—*see* Amazon Br. at 17, 18) in stating that

> Ciphering is a procedure used to secure data that typically involves using a series of steps to scramble and render the data readable only to the intended audience. The procedure itself does not require an outside source, such as a key, in order to encipher or decipher the data. Rather, data can be properly deciphered by the intended audience so long as deciphering exactly follows the enciphering steps to unravel the data. Encryption is a procedure used to secure data. That typically involves the use of an external input for at least one step in the procedure, such as a key, in order to secure and/or access the data. The external data is used to intentionally manipulate at least one step in the encryption or decryption process, changing the way the data processing for encryption occurs. Generally, without the external data or a corresponding decryption key in an encryption process, a step in a corresponding decryption process cannot properly be executed and the data cannot be properly decryption.

943 Patent at 2:7-23. The patentee thus acted as his own lexicographer by using the word "is" after "ciphering" and "encryption" to define those terms, and the patentee's definition must control. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F. 3d 1576, 1582 (Fed. Cir. 2002); *Sinorgchem Co., Shandong, v. Int'l Trade Com'n*, 511 F. 3d 1132, 1136 (Fed. Cir. 2007) ("the

word 'is' . . . may 'signify that a patentee is serving as its own lexicographer' . . . [a]s such, the patentee must be bound by the express definition."). Although the patentee's description is somewhat qualified by the use of "typically," the central, if not only, meaningful distinction drawn between "cipher" and "encrypt" is the use of "an outside source" or "external input," "such as a key," in the latter process but not the former. Additionally, as observed by Amazon (and the Court in its own review), the specification consistently applies the definition of "cipher" (as not requiring a key) and "encryption" (as requiring a key) throughout, and the patent "does not disclose any embodiments of a cipher that use a key to scramble or descramble data, while all the described embodiments use a key for encryption or decryption." Amazon Br. at 19 (citing generally 943 Patent; ECF 87-6 ¶¶ 107-08). Thus, contrary to DivX's argument that a key is merely not required for ciphering, the intrinsic record compels the conclusion that Amazon's construction must be adopted.[17]

DivX arguments to the contrary focus on the Advanced Encryption Standard ("AES"), which it claims uses a key. DivX first notes that that cryptographic material supplied to the cipher may be secured with a "wrap key" and points out that the specification states that the wrap key may specifically use "a wrap key process based on [AES]." DivX Br. at 29 (citing 943 Patent at 8:50-9:60). But the cited portion of the specification discusses wrap keys in context of encryption,

---

[17] DivX's contention that there is "no basis" to require a cipher to "scramble or unscramble data" or "cryptographic material" is belied by the patentee's definition of cipher.

DivX's alternative construction is inappropriate because it would unduly broaden "cipher" to any procedure for securing data, which is contrary to the specification. *Phillips*, 415 F. 3d at 1315 (specification is "the single best guide to the meaning of a disputed term" and "necessarily informs the proper construction of the claims").

In reaching this construction, the Court found persuasive the ITC and Central District of California's construction of "deciphering" in the parent 486 Patent (which shares a specification with the 983 Patent but which did not include a dependent claim reciting AES). *See* ECF 91-4 ("ITC 486 Op.") at 55-61 (constructing "deciphering" as "performing a procedure to unscramble data to make it readable to the intended audience, where the procedure does not require an outside source, such as a key"); 91-5 ("C.D. Cal. 486 Op.") at 14-17 (constructing "deciphering" as "a procedure to unscramble data to make it readable to the intended audience, where the procedure does not use a separate, outside source, such as a key").

not ciphering, and in any case, the specification shows that wrap keys are not "keys" as contemplated by the patentee above because they are not from an "outside source" but rather internally generated. *See* 943 Patent at 9:18-24 ("Any process for generating identical encryption keys without exchange of key material can be used . . . to generate wrapping keys . . . Although some information exchange to enable synchronization between the two wrap key factories can be utilized[.]"); C.D. Cal. 486 Op. at 17. DivX also argues that dependent Claim 2 explicitly recites an embodiment "wherein the cipher comprises an [] [AES] cipher," which emphasizes that the invention permits the use of a key in connection with a 'cipher.'" DivX Br. at 30 (citing *Amdocs (Israel) Ltd. V. Openet Telecom, Inc.*, 2018 WL 1699429, at *11 (E.D. Va. April 6, 2018) (identifying "strong presumption against a claim construction that excludes a disclosed embodiment"). To this, Amazon contends that AES merely "takes a key as input data" and applies a cipher process to it and "does not require a separate key," Amazon Resp. at 15, and suggested at oral argument that "there's nothing [] indicating in Dependent Claim 2 that the [AES] cipher they point to requires the portion of the algorithm that uses a key." Hearing Tr. at 68:16-19. But whether any of this is true or not is irrelevant—even if DivX is correct that AES uses a key, "the specification lends no support to [DivX's position] because it contains no disclosure whatsoever of" a cipher in which a key is used. *Enzo Biochem Inc. v. Applera Corp.*, 599 F. 3d 1325, 1340-42 (Fed. Cir. 2010) (affirming district court construction of term to require "indirect detection" as contemplated by independent claim to the exclusion of "direct detection" as contemplated by dependent claim because specification contained no disclosure of "direct detection" and "the claim language strongly suggests that the [term] must have the capability of being indirectly detected"); *see also Enzo Biochem Inc. v. Applera Corp.*, 780 F. 3d 1149, 1150, 1156–57 (Fed. Cir. 2015) (reversing district court findings that both independent claims and dependent claims were not limited to "indirect detection" based on dependent claims involving "direct detection" because

"dependent claims cannot broaden an independent claim from which they depend"); *see also id.* at 1150 ("the district court erred . . . by finding that the claims at issue covered direct detection").

Accordingly, the Court constructs "cipher" as "a procedure to scramble or unscramble secure data [the cryptographic material] without using a key."

| Final Construction |
|---|
| " a procedure to scramble or unscramble secure data [the cryptographic material] without using a key" |

### E. The 806 Patent – Means-Plus

The 806 patent relates to transcoding, which is the process of converting video from one format or set of encoding parameters to another, typically by decoding the video in a source format and then re-encoding it in a new format. ECF 22-2 ("806 Patent") at 1:23-36. It purports to improve transcoding by generating media metadata for a source video during transcoding but before decoding, and then using that metadata to inform the re-encoding of the video file into an alternate format. *Id.* at 2:39-43, cl. 1. The patent further describes executing transcoding operations on multiple transcoding devices in parallel. *Id.*

### 1. "a computer system configured as a media metadata generation device" – Claim 1

Claim 1 of the 806 Patent recites:

1. A method for transcoding a source video file into a set of multiple alternative video streams, the method comprising:
    generating, at a computer system configured as a media metadata generation device, media metadata related to the source video file prior to decoding, during a transcoding of, at least a portion of the source video file, where the media metadata comprises scene complexity information:
    providing information based on the media metadata from the computer system to a plurality of transcoding devices; and
    performing the following at each of the plurality of transcoding devices in parallel:
        receiving the at least a portion of the source video file . . .
        decoding the at least a portion of the source video file . . .

receiving the information based on the media metadata from the computer system; and

encoding the plurality of decoded images of the decoded portion of video into an alternate video stream . . .

| DivX Construction | Amazon Construction |
|---|---|
| No construction needed. Not subject to AIA § 112(f) and not indefinite.<br><br>Alternatively:<br>Function: Generating media metadata<br><br>Structure: Media metadata source 106 in Fig. 1 and related disclosures regarding algorithms for generating media metadata | Subject to AIA § 112(f) and indefinite.<br><br>Function: Generating media metadata related to the source video file prior to decoding, during a transcoding of, at least a portion of the source video file, where the metadata comprises scene complexity information<br><br>Structure: Indefinite for inadequate disclosure of structure corresponding to the function. |

Regarding the claim term, Amazon, at step one of the means-plus-function analysis, argues that it is subject to Section 112(f) because "computer system configured as a media metadata generation device") carries out the specialized function of generating media metadata (related to the source video file prior to decoding, during a transcoding of, at least a portion of the source video file, where the media metadata comprises scene complexity information) which constitutes "recit[ation] of function without reciting structure for performing that function." Amazon Br. at 22, 23; Amazon Resp. at 17 (citing *Williamson*, 792 F. 3d at 1348) ("even if a generic 'computer system' . . . refers to a structure, it does not refer to a structure for performing the detailed function recited by the claim"). DivX denies that Section 112(f) applies because: (1) claim 1 is a "method claim" subject to "step-plus-function" analysis (and "generating" is a method step); (2) "computer system" is akin to "processing system" in *Cox Commc'ns v. Sprint Commc'n Co. LP.*, 838 F. 3d 1224, 1233 (Fed Cir. 2016), which did not affect the scope of the claims;[18] and (3) even if

---

[18]    The Court does not find this argument relevant because the parties in *Cox* agreed that "processing system" was not a means-plus-function term and the court accordingly addressed whether "processing system" rendered

"computer system" is a structural feature, it does not recite the word "means" so there is a presumption that Section 112(f) does not apply, which Amazon cannot overcome in light of the specification's disclosures and case law. DivX Br. at 10–14; DivX Resp. at 11–12. At step two, DivX contends that sufficient structure is provided by way of "media metadata source 106" and disclosed algorithms for calculating "scene complexity information" that makes up "media metadata," DivX Br. at 14, 15; DivX Resp. at 12, 13, but Amazon rejects these algorithms as inapplicable, rendering the claims indefinite. Amazon Resp. at 19, 20.

At step one, the Court finds that "computer system" is subject to Section 112(f). The means-plus two-step analysis is relevant because the "computer system" is an apparatus ("device") nested within a method claim.[19] *See Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F. 3d 1002, 1006 (Fed. Cir. 2021). Thus, the Court must first determine whether the limitation is drafted in means-plus-function form and whether it connotes sufficiently definite structure to a POSITA. Because the term "means" is not recited, there is a rebuttable presumption that Section 112(f) does not apply, *Williamson*, 792 F. 3d at 1348, but this may be overcome and Section 112(f) will apply if it is shown that "the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id*. at 1349; *see also id*. (presumption exists but is not "strong"). Amazon has met that burden here. The term "computer system" refers to a generic computer and would require special programming to carry out the recited function. ECF 87-6 ¶¶ 61-64. So too does "a computer system configured as a media metadata generation device" fail to suggest any particular structure to a POSITA. *Id*. Thus, the

---

patents indefinite under Section 112 ¶ 2. 838 F. 3d at 1228. Further, it is not true that "computer system" does not affect the scope of the claim here, as evidenced by the patentee's reliance on the term to overcome a prior art rejection in prosecution. ECF 89-18 at -947, -955.

[19] DivX claims that "computer system" is "clearly relates to performing the step itself" and is "merely" an environment in which the method step is performed, but how this is so is neither explained nor compelling. DivX Br. at 11; DivX Resp. at 10.

claim "recites function without reciting structure for performing that function." *Williamson*, 792 F. 3d at 1348. The Court finds that Amazon has demonstrated by a preponderance of evidence that the term is drafted in a means-plus-function format.[20]

At step two, the Court's task is to determine "what structure, if any, disclosed in the specification corresponds to the claimed function." *Williamson*, 792 F. 3d at 1351. Here, the function is "generating . . . media metadata related to the source video file prior to decoding, during a transcoding of, at least a portion of the source video file, where the media metadata comprises scene complexity information." 806 Patent at 13:49-54. Because this "function is performed by a general-purpose computer or microprocessor, then the second step generally further requires that the specification disclose the algorithm that the computer performs to accomplish that function." *Rain Computing, Inc.*, 989 F.3d at 1007; *Daedalus Blue, LLC*, 2022 WL 1611758, at *4. As for corresponding structure, the specification discloses "media metadata source 106," 806 Patent at Fig. 1, as well as "well-known" algorithms for calculating "spatial" and "temporal" "picture complexity information." 806 Patent at 4:45-5:14; *see also* ECF 89-19 ¶¶ 41–51. It is apparent from the specification that a POSITA would understand such information is enveloped in the "scene complexity information" which comprises "media metadata." *See* 806 Patent at 4:31-33 ("the metadata can include information about one or more video scenes, each of which can be composed of a set of images that have similar content"), 4:55-62, 5:3-11; ECF 89-19 ¶ 41. To this, Amazon's expert Dr. Schonfeld asserts that picture complexity is merely "related" to and distinct

---

[20]    DivX also argues, through the declaration of its expert Dr. Mangione-Smith, that Section 112(f) does not apply because a POSITA would understand "computer system" to "connote well-known contemporaneous devices that generated media metadata, such as systems with conventional encoding software," based primarily on the specification's disclosure of "well-known" algorithms for calculating "spatial" and "temporal" complexity. DivX Br. at 13, 14 (citing ECF 89-19 ¶¶ 37, 41, 60). Whether the specification discloses algorithms to perform the claimed function is relevant to step two, not step one. *See Rain Computing, Inc.*, 989 F. 3d at 1007 ("If the function is performed by a general-purpose computer or microprocessor, then the second step generally further requires that the specification disclose the algorithm that the computer performs to accomplish that function."); *see also Amdocs*, 2018 WL 1699429, at *17 (observing that whether term is a "means-plus-function" term is "distinct" from whether "the specification discloses corresponding structure for a term that has been found to be a means-plus-function term").

from scene complexity and that the recited algorithms are inapplicable to generation of media metadata prior to decoding, but these claims are not explained or substantiated. ECF 91-2 at 120:4-7, 12-15; ECF 87-6 ¶ 64; Amazon Resp. at 19. It follows then that the algorithms constitute sufficient structure that is both "capable of performing the recited function" and "clearly linked or associated with the recited function." *Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc.*, 248 F. 3d 1303, 1311 (Fed. Cir. 2001).

Accordingly, the Court finds that "a computer system configured as a media metadata generation device" is subject to Section 112(f) and has the function of "generating media metadata related to the source video file prior to decoding, during a transcoding of, at least a portion of the source video file, where the metadata comprises scene complexity information" with structure media metadata source 106 in 806 Patent Fig. 1 and related disclosures regarding algorithms for generating media metadata.

| Final Construction |
|---|
| Subject to AIA § 112(f) but not indefinite.<br><br>**Function:** Generating media metadata related to the source video file prior to decoding, during a transcoding of, at least a portion of the source video file, where the metadata comprises scene complexity information.<br><br>**Structure:** Media metadata source 106 in Fig. 1 and related disclosures regarding algorithms for generating media metadata. |

## F. The 943 Patent – Means-Plus

### 1. "video decoder process;" "digital rights management (DRM) process" / "DRM process" – Claims 1, 11 (Means-Plus)

In relevant Part, Claims 1 and 11 of the 943 Patent recite

1. A playback device for playing back encrypted video, the playback device comprising:
. . . .

Memory containing  . . . machine readable instructions for a video decoder process and digital rights management (DRM) process;

. . . .

wherein the machine readable instruction for the video decoder process are capable of causing the set of one or more processors to perform steps of:

unpacking the DRM information and the video frame data from the buffer;

locating the encrypted portion of the video frame data with the offset and length information;

securely providing the cryptographic material and the encrypted portion of the video frame data to the DRM process;

wherein the machine readable instructions for the DRM process are capable of causing the set of one or more processors to perform steps of:

providing the cryptographic material to a cipher to obtain a decryption key; and

obtaining decrypted video frame data by decrypting the encrypted portion of the video frame data based upon the obtained decryption key; and

wherein the machine readable instruction for the video decoder process are further capable of causing the set of one ore more processors to perform a step of:

decoding the encoded frame of video for rendering on a display device using the decrypted video frame data.

11. The playback device of claim 1, wherein:

the playback application is further capable of causing the set of one or more processors to perform a step of:

inserting a frame key payload in the buffer; and

the machine readable instructions of the video decoder process are further capable of causing the set of one or more processors to perform a step of securely providing the frame key payload to the DRM process.

| DivX Construction | Amazon Construction |
|---|---|
| "video decoder process" - <br><br> No construction needed. Alternatively, plain and ordinary meaning, i.e., one or more machine readable instructions for causing the one or more processors to perform one or more steps as claimed. | Subject to 35 U.S.C. § 112, ¶ 6. <br><br> Functions: "unpacking the DRM information and the video frame data from the buffer; locating the encrypted portion of the video frame data with the offset and length information; securely providing the cryptographic material and the encrypted portion of the video frame data to the DRM process; . . . decoding the encoded frame of video for rendering on a display device using the decrypted video frame data." (cl. 1); "securely providing the frame key payload to the DRM process." (cl. 11) <br><br> Structure: the decoder 20 and the digital rights manager 25 component (including the decrypt engine 26, bit stream decoder 27, payload parser 28, and wrap key factory 29) |
| "DRM process" – <br><br> No construction needed. Alternatively, plain and ordinary meaning, i.e., one or more machine readable instructions for causing the one or more processors to perform one or more steps as claimed. | Subject to 35 U.S.C. § 112, ¶ 6. <br><br> Functions: "providing the cryptographic material to a cipher to obtain a decryption key; and obtaining decrypted video frame data by decrypting the encrypted portion of the video frame data based upon the obtained decryption key." <br><br> Structure: Digital rights manager 25 |

The parties dispute regarding "video decoder process" and "DRM process" is essentially the same between the two terms. At step one, Amazon argues that the terms are subject to Section 112 ¶ 6 means-plus function analysis because no structure or algorithm is recited for performing the detailed functions of "unpacking . . .; locating . . .; providing . . .; decoding, . . .; [and] securely providing" ("video decoder process" – 943 Patent at 11:24-33, 41-47, 12:37-46) and "providing . . .; and obtaining . . ." ("DRM process" – 943 Patent at 11:34-41). Amazon Br. at 25, 26. DivX denies this, claiming that Amazon cannot overcome the presumption that Section 112 ¶ 6 does not apply and mischaracterizes the steps taken by the processes at issue as functions, which is wrong

because the steps provide structure. DivX Br. at 23–25, 27–28; DivX Resp. at 22–23 ("the claim language itself defines the [processes] as 'machine readable instructions' contained in 'memory,' and 'causing [a] set of one or more processors to perform [the recited] steps"). At step two, Amazon states that the structure for performing the functions of the "video decoder process" are the decoder 20 and digital rights manager 25 (including its constituent parts bit stream decoder 27, decrypt engine 26, payload parser 28, and wrap key factory 29), and that the structure for "DRM process" is digital rights manager 25 (including its constituent parts). Amazon Br. at 27, 28, 30. To this, DivX did not identify any corresponding structure if step two were to apply. Amazon Resp. at 25.

At step one, the Court determines that "video decoder process" and "DRM Process" are not subject to Section 112 ¶ 6. A presumption against application of Section 112 ¶ 6 exists because of the lack of "means" in the claim term. But Amazon does not show that the terms "fail[] to recite sufficiently definite structure or else recite[] function without reciting sufficient structure for performing that function." *Williamson*, 792 F. 3d at 1349 (cleaned up). Here, sufficient structure has been recited in the language's definition of the processes as "machine readable instructions" contained in "memory" and "capable of causing [a] set of one or more processors to perform" various functions. Because the "specific structure of software code and applications is partly defined by its function," the Court may consider the "functional language to see if a [POSITA] would have understood the claim limitation as a whole to connote sufficiently definite structure." *WSOU Investments LLC v. Google LLC*, 2023 WL 6889033, at *1–2, 4 (Fed. Cir. 2023) (citing *Dyfan LLC v. Target Corp.*, 28 F. 4th at 1368); *see also id*. at *5 ("We have explained that claim limitations, like the recited 'computer program code,' when combined with a description of what the code is intended to accomplish, convey definite structure to the [POSITA].") As in *Amdocs*, that language does not "simply describe[]s broadly phrased high-level functions" without

providing insight into "how the computer code operates." Amazon Resp. at 21, 22; *Amdocs*, 2018 WL 1599429, at *17; *Apple, Inc. v. Motorola, Inc.*, 757 F. 3d 1286, 1299 (Fed. Cir. 2014).

Accordingly, the Court finds that "video decoder process" and "DRM process" are not subject to Section 112 ¶ 6 and that no construction is necessary.

| Final Construction |
|---|
| **"video decoder process" – not subject to Section 112 ¶ 6, no construction necessary.** |
| **"DRM process" – not subject to Section 112 ¶ 6, no construction necessary.** |

## III.    CONCLUSION

For the foregoing reasons, the Court issues this Memorandum Opinion and Order as the construction of the nine disputed claim terms in the Asserted Patents.

The Clerk is directed to forward a copy of this Order to counsel of record.

**IT IS SO ORDERED**.

/s/
_____
Michael S. Nachmanoff
United States District Judge

October 22, 2025
Alexandria, Virginia